1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

Neal Arthur Herrell,
Petitioner
-vs-
James O'Neil, et al.,
Respondents.

CV-15-2416-PHX-DJH (JFM)

**Report & Recommendation**
**on Petition for Writ of Habeas Corpus**

## I.  MATTER UNDER CONSIDERATION

Petitioner, presently incarcerated in the Arizona State Prison Complex at Kingman, Arizona, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on November 25, 2015 (Doc. 1).  On February 29, 2016 Respondents filed their Response (Doc. 13).   Petitioner has not replied.

The Petitioner's Petition is now ripe for consideration.   Accordingly, the undersigned makes the following proposed findings of fact, report, and recommendation pursuant to Rule 8(b), Rules Governing Section 2254 Cases, Rule 72(b), Federal Rules of Civil Procedure, 28 U.S.C. § 636(b) and Rule 72.2(a)(2), Local Rules of Civil Procedure.

## II.  RELEVANT FACTUAL & PROCEDURAL BACKGROUND
### A.  FACTUAL BACKGROUND

In disposing of Petitioner's first direct appeal, the Arizona Court of Appeals summarized the facts as follows:

> On August 15, 20.08, a Phoenix Police Department Special
> Assignments Unit ("SWAT team") as well as several squads of the
> Phoenix Police Department Neighborhood Enforcement Team
> arrived at Defendant's house in Phoenix to serve Defendant with a

1

search warrant and execute a search on the residence. The officers had knowledge ahead of time that there were surveillance cameras posted on the outside of the residence that monitored the street; accordingly, they took tactical precautions when approaching the house.

The SWAT team did a "knock and announce" at the front door of the house, stating "Phoenix Police Department, search warrant." When no one inside the house responded, the SWAT team breached an outer black security door at the front entrance. Employing a four-foot battering ram, the officers next attempted to ram through the deadlock on the wooden front double doors, but were unable to do so after eleven attempts because the door was heavily reinforced with steel strips.

The wooden doors were eventually opened by John Woodruf, who rented a trailer in Defendant's backyard. Woodruf and Defendant were the only two occupants in the western portion of the house when the SWAT team entered.

Once inside the house, the officers observed an activated video surveillance monitor.  The house had two bedrooms, one on the south and one on the north side. The south bedroom had a child's crib in it and appeared to be largely unused. The officers located no evidence in it.

The north bedr0om, however, contained a bed and a desk, and appeared to the officers to be occupied by Defendant. The room was full of "clutter" and had "bunch[es] of bandanas hanging from the ceiling, stuff [lying] out on the floor, [and] soda cans and stuff on the desk."  The bedroom, which was not very large, was almost entirely filled by the bed. Defendant's cell phone and keys were located on the bed. On the desk immediately next to the bed was a traffic citation made out to Defendant along with a fully-loaded .45 caliber revolver, scales, a small bag of marijuana, a wooden box: containing rolling papers and baggies, additional packaging material, and approximately $225 in cash. Inside a closet in the bedroom, officers located a .22 caliber Ruger rifle and magazine and a .22 caliber Remington rifle, as well as a tin containing ten small bags of marijuana and a pill bottle filled with marijuana.  On a gun rack affixed to the wall just outside the north bedroom, officers located "five boxes of ammunition for various caliber guns, including a .45 caliber gun, a . 22 caliber gun, and a .38 caliber gun."

On the day he was arrested, Defendant told the officers that he owned the residence and that he and his wife were living there and, specifically, staying in the north bedroom. In all, the officers recovered approximately 130 grams, or slightly less than five ounces of marijuana from Defendant's residence. To the officers, the amount of drugs and the amount and type of drug paraphernalia involved, as well as the cameras, the weapons, and the cash located at the house indicated that the owner intended to sell the drugs.

(Exhibit K, Mem. Dec. 5/26/11 at 2-5.) (Exhibits to the Answer, Doc. 13, are referenced

herein as "Exhibit ___.")

**B.** **PROCEEDINGS AT TRIAL**

On August 19, 2008, Petitioner was charged in Maricopa County Superior Court on one count of possession of marijuana for sale, two counts of misconduct involving weapons (one related to the simultaneous marijuana possession and the other related to Petitioner's status as a prohibited possessor), and one count of drug paraphernalia. (Exhibit A, Complaint; Exhibit P, Mem. Dec. 1/8/13 at 2.)

In disposing of Petitioner's second direct appeal, the Arizona Court of Appeals described plea negotiations as follows:

> At the settlement conference, the prosecutor agreed with defense counsel that she did not "think" the sentences could be consecutive, and defense counsel accordingly explained to Herrell that, if convicted, his presumptive sentence would be ten years, and his maximum sentence fifteen years. Herrell rejected the State's plea offer of a stipulated four-and-a-half year sentence, believing "the plea offer [was] ridiculous and explaining that he believed that he would be successful on a motion to suppress or at trial. At a later hearing on Herrell's request that he be allowed to waive counsel and represent himself, the prosecutor reiterated that she "believe [d]" the sentences on the counts "would run concurrent."

(Exhibit P, Mem. Dec. 1/8/13 at 2.)

Petitioner proceeded to trial, was convicted of all charges, and sentenced to 3.75 years on the paraphernalia charge, and ten years on each of the other three charges. The trial court directed that two of the ten years sentences be consecutive, and the remainder be concurrent, an effective sentence of 20 years.[1]  (Exhibit K, Mem. Dec.  5/26/11 at 6.)

**C.** **PROCEEDINGS ON FIRST DIRECT APPEAL**

Petitioner filed a direct appeal, raising claims of improper enhancement with prior felonies, improper use of an eight person jury, and equitable estoppel from the imposition of consecutive sentences.

The Arizona Court of Appeals rejected the first two claims, and sidestepped the estoppel issue, but granted relief on the consecutive sentencing, noting the State

---

[1] The Arizona Court of Appeals described all the sentences as being consecutive to each other.  (Exhibit K, Mem.Dec. 5/26/11 at 2.)  However, that court also described the sentence as being an effective "twenty year sentence." (*Id.* at 15.)

3

conceded it was error to impose consecutive sentences on the marijuana charge and the related weapons charge.  Accordingly, the court affirmed Petitioner's convictions, but vacated his sentences and remanded for resentencing.  (Exhibit K, Mem. Dec. 5/26/11.)

Petitioner sought review from the Arizona Supreme Court, who denied review on November 9, 2011.  The Arizona Court of Appeals issued its mandate on December 12, 2011.  (Exhibit K, Mandate.)

**D.     RESENTENCING**

On February 2, 2012, Petitioner was again sentenced to 3.75 years on the paraphernalia charge, and ten years on each of the other three charges, but this time the court ordered that the sentence on the marijuana charge and prohibited possessor weapons charge be served consecutively, and the remainder of the charges to be concurrent to the marijuana charge.  (Exhibit L, Sentence 2/2/13. *See also* Exhibit P, Mem. Dec. 1/8/13 at 3.)

**E.     PROCEEDINGS ON SECOND DIRECT APPEAL**

Petitioner then filed a second direct appeal (Exhibit M, Opening Brief), again arguing the estoppel issue regarding consecutive sentences, and that he should have received credit for time served toward both of the consecutive sentences.  The Arizona Court of Appeals rejected both arguments and affirmed his sentences.  (Exhibit P, Mem. Dec. 1/8/13.)  Petitioner did not seek reconsideration or review, and the Arizona Court of Appeals issued its mandate on February 19, 2013.  (Exhibit P, Mandate.)

**F.     PROCEEDINGS ON POST-CONVICTION RELIEF**

On April 27, 2012, during the pendency of his second direct appeal, Petitioner filed through counsel a Notice of Post Conviction Relief (Exhibit Q).  Petitioner filed an original Petition for Post-Conviction Relief on July 5, 2012 (Exhibit R), but filed an Amended Petition on August 16, 2012 (Exhibit S).  Petitioner's Amended Petition asserted an ineffective assistance claim under *Missouri v. Frye*, 566 U.S. ____, 132 S.Ct.

4

1399 (2012), based upon misrepresentations to Petitioner by counsel, the court, and prosecutors, that at trial Petitioner would face only concurrent sentencing.  The state responded that Petitioner could not show prejudice because he was determined to seek acquittal to preserve a relationship with a 22 month old daughter, who would otherwise be placed into the foster care system.  (Exhibit T, PCR Response.)

On January 9, 2013, the PCR court dismissed the petition, concluding "Defendant fails to make any colorable claim for post-conviction relief for the reasons given in the State's Response."  (Exhibit V, M.E. 1/9/13.)

Petitioner sought review by the Arizona Court of Appeals, which granted review, similarly concluded that Petitioner failed to show prejudice (albeit based on Petitioner's expectations of success, rather than his motivation to avoid any sentence) and denied relief.  (Exhibit W, Mem. Dec. 10/21/14.)

Petitioner then sought review by the Arizona Supreme Court, which was denied on March 19, 2015.  The Arizona Court of Appeals issued its mandate on May 4, 2015.  (Exhibit W, Mandate.)

## G.   PRESENT FEDERAL HABEAS PROCEEDINGS

**Petition** - Petitioner commenced the current case by filing his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on November 25, 2015 (Doc. 1).  "Petitioner raises one ground for relief, arguing that his trial counsel was ineffective because she advised him that, if convicted, his sentences would run concurrently.  Petitioner states that he would have accepted the plea he was offered had he known that he could be sentenced consecutively."  (Order 12/11/15, Doc. 3 at 1.)

**Response** - On February 29, 2016, Respondents filed their Response ("Answer") (Doc. 13).  Respondents argue Petitioner's claim is without merit, and the Arizona Court of Appeals properly adjudicated it to be so.

**Reply** – The Court's service Order filed December 11, 2015 (Doc. 3) gave Petitioner 30 days from service of the Answer to reply in support of the Petition.  That

1    time has passed and Petitioner has not replied in support of his Petition.

2

3                    **III.    APPLICATION OF LAW TO FACTS**
4    **A.    GROUND ONE – INEFFECTIVE ASSISTANCE**
     **1. Parties Arguments**
5
6           In his sole ground for relief, Petitioner argues that he received ineffective
7    assistance of counsel when counsel failed to correct erroneous representations that if
8    convicted at trial, all sentences would be concurrent.  (Petition, Doc. 1 at 6.)

9
     **2. Standard for Relief**
10
11          **Standard Applicable on Habeas** - While the purpose of a federal habeas
12   proceeding is to search for violations of federal law, in the context of a prisoner "in
13   custody pursuant to the judgment a State court," 28 U.S.C. § 2254(d) and (e), not every
     error justifies relief.
14
15          **Errors of Law** - "[A] federal habeas court may not issue the writ simply because
16   that court concludes in its independent judgment that the state-court decision applied [the
     law] incorrectly." *Woodford v. Visciotti*, 537 U. S. 19, 24– 25 (2002) (per curiam).  To
17   justify habeas relief, a state court's decision must be "contrary to, or an unreasonable
18   application of, clearly established Federal law, as determined by the Supreme Court of
19   the United States" before relief may be granted.  28 U.S.C. §2254(d)(1).

20          **Errors of Fact** -  Federal courts are further authorized to grant habeas relief in
21   cases where the state-court decision "was based on an unreasonable determination of the
22   facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §
23   2254(d)(2).  "Or, to put it conversely, a federal court may not second-guess a state court's
24   fact-finding process unless, after review of the state-court record, it determines that the
25   state court was not merely wrong, but actually unreasonable."  *Taylor v. Maddox*, 366
26   F.3d 992, 999 (9th Cir. 2004).

27

28
                                          6

Moreover, a state prisoner is not free to attempt to retry his case in the federal courts by presenting new evidence. There is a well-established presumption of correctness of state court findings of fact. This presumption has been codified at 28 U.S.C. § 2254(e)(1), which states that "a determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner has the burden of proof to rebut the presumption by "clear and convincing evidence."

**Applicable Decisions** – In evaluating state court decisions, the federal habeas court looks through summary opinions to the last reasoned decision. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

**3. Standard for Ineffective Assistance**

**Applicable Standard on Ineffective Assistance Claims** – Generally, claims of ineffective assistance of counsel are analyzed pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prevail on such a claim, Petitioner must show: (1) deficient performance - counsel's representation fell below the objective standard for reasonableness; and (2) prejudice - there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687-88. Although the petitioner must prove both elements, a court may reject his claim upon finding either that counsel's performance was reasonable or that the claimed error was not prejudicial. *Id.* at 697.

There is a strong presumption counsel's conduct falls within the wide range of reasonable professional assistance and that, under the circumstances, the challenged action might be considered sound trial strategy. *U.S. v. Quinterro-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995), *cert. denied*, 519 U.S. 848 (1996); *U.S. v. Molina*, 934 F.2d 1440, 1447 (9th Cir. 1991). The court should "presume that the attorneys made reasonable judgments and decline to second guess strategic choices." *U.S. v. Pregler*, 233 F.3d 1005, 1009 (7th Cir. 2000).

An objective standard applies to proving such deficient performance, and requires

a petitioner to demonstrate that counsel's actions were "outside the wide range of professionally competent assistance, and that the deficient performance prejudiced the defense." *United States v. Houtcens*, 926 F.2d 824, 828 (9th Cir. 1991) (quoting *Strickland*, 466 U.S. at 687-90).    The reasonableness of counsel's actions is judged from counsel's perspective at the time of the alleged error in light of all the circumstances. *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *Strickland*, 466 U.S. at 689.

In the context of a rejected plea offer, "a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler v. Cooper*, 132 S.Ct. 1376, 1385 (2012).

**4.  Factual Background**

Petitioner appeared for a settlement conference on May 29, 2009.  The following transpired:

> THE COURT: All right. This is the time set for settlement conference. I'm sure your lawyer has talked to you about what we do here, we talk about your case, talk about the plea offer, find out what kind of a resolution you're looking for.
> THE DEFENDANT: Well, I didn't find out until Wednesday before last that she wasn't going to file a motion to suppress, which I've been trying to get filed since the  beginning of this case because I have had three opinions saying that that's the avenue I need to go. It looked like we were going that way and then I find five working days ago  that she wasn't going to do it and I had to come up with a decision on Friday of whether to take the plea agreement or  not.
> Well, I feel like since I only came to know that she wasn't going to file the suppression motion five working days ago, that I should be allowed to either go pro per or the trial date be vacated and I be given more time, to either file this motion to suppress on my own, or to be  able to get an attorney that will file the motion to suppress. I've had three opinions from separate lawyers that they say I have good issues for the suppression.
> THE COURT: Okay. Well, certainly you can hire a lawyer and they can file it. It doesn't mean the judge is going to grant it.

8

Have you, yourself -- I guess you talked to those lawyers, the problem is this, when you file a  motion then you don't have an opportunity to take advantage  of the plea.

THE DEFENDANT: Right.

MS. HALSTENRUD [prosecutor]: And if you lose, you don't get a plea.

THE COURT: Yeah, there's no plea.

(Exhibit B, R.T. 5/29/9 at 3-4.)  The court pressed Petitioner on his plan for trial:

THE DEFENDANT: My plan is to file a motion to suppress and if it doesn't go, then I plan to go to trial.

THE COURT: Right, so what's your plan at trial?

THE DEFENDANT: To plead not guilty.

THE COURT: Right, how are you going to defend your case? How is your lawyer going to defend your case?

THE DEFENDANT: How is my lawyer going to defend my case? Everything they found in the house, I was either not aware of or it didn't belong to me.

THE COURT: Was it your house?

THE DEFENDANT: My house.

THE COURT: How do you think that's going to go over with the jury?

THE DEFENDANT: I think it will go over well, especially if the person comes forward and says I knew nothing about it, it was theirs.

THE COURT: So in your house, the marijuana, the guns, the paraphernalia, you're going to say you knew nothing about it?

THE DEFENDANT: That's right.

THE COURT: So you're going to have to take the stand, you're going to be impeached with your prior convictions, right, so they're going to know you have a prior felony, correct, and that you were living in a house with all these items and you don't know anything about them, that's your defense?

THE DEFENDANT: That's right.

THE COURT: It's not a strong defense, you know that. I'm not telling you anything you don't know, right?

THE DEFENDANT: I didn't know about the guns being there. I didn't know about the marijuana being there.

THE COURT: Whether you did or whether you didn't, I'm just going to tell you that I don't think a jury is going to find that credible. First of all, you're going to have to testify to get your side of the story out, all right, so you're going to be subject to cross-examination.  I don't think it's a tricky cross, I think that the State is just going to put out there and argue that that's completely ridiculous that you were living in a house with guns and  marijuana and scales and have no knowledge of it.

THE DEFENDANT: The guns came to my house the night before when I was gone.

THE COURT: You said you didn't know they were even there.

THE DEFENDANT: Well, after the fact I did, in hindsight I did.

THE COURT: Well, I'm just telling you that I don't think it's a good defense. I don't think it's a credible story for a jury to believe

that you had all this merchandise in your house and you didn't know about it.

MS. HALSTENRUD: On top of that, whoever is going to come in and take responsibility for the marijuana that came into your house the night before, they're going to need a lawyer and their lawyer is probably going to tell them not to take the stand and say that.

THE COURT: Or you're going to rely on someone who might incriminate themself. So it's going to be police officer after police officer after police officer and then you saying, "I lived there, but I didn't know that the stuff was in the house, and yeah, I've been convicted before of felonies, but I still didn't know."

THE DEFENDANT: I knew about the pistol, it belonged to my wife. We have a bill of sale, she bought it over a year before, I knew about that. I knew there were some scales in the house. But as far as the marijuana goes, or the two rifles they found, I was not aware of them.

THE COURT: You know you're a prohibited possessor, correct, and you're not allowed to possess weapons?

MS. HALSTENRUD: Well, you knowing about the pistol is enough. All you have to have is access to it in order to be found guilty under the law in Arizona. So that's not much of a defense, just so you know.

THE COURT: I'll tell you, Mr. Herrell, I'm not here to try to ram a plea agreement down your throat. I mean, if you want to go to trial, that's fine. I just want you to have a realistic picture, the whole picture. You are kind of zeroed in on this suppression issue and you obviously have blinders on as to everything else that's going on with your case and you need to take a step back and look at the whole picture, because I'll tell you, there's a small percentage of motions, suppression motions, and I can't give you a number that are granted, but for the most part, you know, they're just not.

(*Id.* at 5-9.)

Petitioner was also advised that counsel did not believe there was a viable motion to suppress:

MS. HINDMARCH [defense counsel]: Your Honor, for the record, I have had an opportunity to interview the officer that was the affiant to the search warrant and Mr. Herrell has had an opportunity to listen to that tape.

THE DEFENDANT: I have not had an opportunity to listen to it.

MS. HINDMARCH: It's been provided to him. I informed Mr. Herrell that I don't believe I have a basis to file a motion to suppress for the filing of the search warrant and I won't be filing that motion.

(*Id.* at 10.)   The court also reviewed with Petitioner the terms of the plea and Petitioners' exposure at trial:

THE COURT: Mr. Herrell, the offer, as you know, is four and a half. Mr. Herrell, on this case, a Class 4 with two priors, each

10

count -- well, I should say three counts, are a minimum of well, the presumptive in your case realistically would be the minimum, is ten years. So even if you got concurrent sentences, you're less than half of your exposure with the plea. You're putting all your eggs in this suppression basket, and I'll tell you what, it doesn't seem like that that's necessarily the best decision.

(*Id.* at 11.)

Despite all the dire warnings, Petitioner remained determined when the court inquired about Petitioner's resistance to the plea offer:

> THE COURT: Mr. Herrell, what's the main block in your case?
> THE DEFENDANT: Well, for one thing the plea offer is ridiculous. I have a daughter that I've been in compliance with CPS for over a year and the judge is waiting  for this to conclude, to either give me back my custody of  her or for her to remain where she's at. I will do anything I can to get custody of my daughter. I've been in compliance and he's waiting for this to be adjudicated.
> THE COURT: How old is your daughter?
> THE DEFENDANT: She's 22 months. ·
> THE COURT: So if you go to trial and you lose, she'll be a teenager. If you take the plea agreement, you may have the opportunity to be there for part of her childhood.
> THE DEFENDANT: No, because my rights will be severed and she'll be in foster care.
> THE COURT: Well, then you know what, that's a  path that started long ago, you know what I mean?
> THE DEFENDANT: It may have started long ago, but I didn't start it.
> THE COURT: You need to stay focused on this case, because even if you go trial and you win this case, the judge could still decide against you. There's no promises. So I know that's a difficult situation, but don't let it be determinative in how you handle your case, you know what I mean?
> THE DEFENDANT: It's got to be.
> THE COURT: Well, then you can see your daughter in four and a half years or you can see your daughter in ten plus years.
> THE DEFENDANT: Or I can see her maybe by the end of this trial or by the time the motion to suppress is ruled on if I get it in, if I'm given at least a reasonable time.  I mean, I was given five working days to know it wasn't going to be filed and I don't think that's reasonable at all.

(*Id.* at 13-15.)  The court then again compared the plea offer with the exposure at trial.

> MS. HINDMARCH [defense counsel]: And just to make sure we're on the same page with the State, I don't believe that any of the counts could be stacked; do you agree with that?
> MS. HALSTENRUD [prosecutor]: I don't think they could.
> MS. HINDMARCH: So then, just so Mr. Herrell is clear, he's facing a presumptive of ten years with a maximum of 15 and a super-minimum of six and the plea offer is for a stipulated four and a half. Am I correct that you want to reject that plea?

11

THE DEFENDANT: Yeah.

(*Id.* at 15-16.)

At a hearing on Petitioner's motion to represent himself, the court again reviewed

Petitioner's exposure at trial:

> THE COURT: Okay. For a Class 4 felony -- and you've been charged with three Class 4 felonies with two allegeable prior felony convictions -- the presumptive sentence is 10 years in the Department of Corrections, the maximum sentence is 12 years, the aggravated sentence is 15 years, the minimum sentence is eight years, and the mitigated sentence is six.
> For a Class 6 felony with two prior felony convictions, the presumptive sentence is 3.75 years, the maximum is 4.5, the aggravated is 5.75, the minimum sentence is three years, and the mitigated sentence is 2.25 years.
> Can those sentences be run consecutively, or do they have to reason [sic] concurrent?
> MS. HALSTENRUD [prosecutor]: I believe they would run concurrent.
> THE COURT: Okay. So the maximum time that you could do, if you get the presumptive sentence, would be 10 years. The maximum could be 15, if you got an aggravated sentence.
> So you understand that? And you would not be eligible for release until the prison sentence is served. You could receive release credits for one day for every six days served.
> Do you understand that?
> THE DEFENDANT: Yes, ma'am.

(Exhibit C, R.T. 8/10/9 at 6-7.)


## 5.  State Court Decision

Here the relevant, last reasoned decision on Petitioner's claim is that of the

Arizona Court of Appeals on review of Petitioner's PCR Petition.  The Arizona Court of

Appeals quoted the companion to *Lafler*:

> "To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." *Missouri v. Frye*, 132 S. Ct. 1399, 1409 (2012).

(Exhibit W, Mem. Dec. at ¶ 4.)  The court found:

> We have already determined on two previous occasions that there is no reasonable probability Herrell would have accepted the plea offer if anyone had told him he was exposed to consecutive sentences…
> The record reflects that Herrell rejected the plea offer because he

believed he would be successful in a motion to suppress or at trial,
and he believed the offer 'ridiculous.' "

(Exhibit W, Mem. Dec. at ¶¶ 5, 8.)   Based on those findings, the court rejected Petitioner's claim.

**6. Application of Law to Facts**

    **a.   Deficient Performance**

Respondents do not address deficient performance.   The Arizona Court of Appeals did not either.   The undersigned finds no basis for a finding of deficient performance.

Here, at both the settlement conference and at the hearing on the motion for self-representation, trial counsel solicited and obtained representations from the prosecution that Petitioner's sentences would not be concurrent at trial.   Trial counsel was silent in the face of representations by the court that Petitioner's maximum exposure at trial was 15 years.

Instead, after re-sentencing, he received an effective sentence of 20 years.

In *U.S. vs. Garcia*, 909 F.2d  1346 (9th Cir. 1990) the Ninth Circuit held that an erroneous prediction of a sentence by a defense attorney did not rise to the level of constitutional deficient representation, and thus did not render a plea based upon such erroneous prediction involuntary.   Cases both prior to and since *Garcia* have differentiated between simple errors in predictions and a gross mischaracterization of the likely outcome.   For example, in *U.S. vs. Michl*in, 34 F.3d 896 (9th Cir. 1994) the Ninth Circuit recognized that the court has "held that 'an erroneous prediction by defense attorney concerning sentencing does not entitle a defendant to challenge his guilty plea,' although an exception might be made in a case of 'gross mischaracterization of the likely outcome.'" *Michlin*, 34 F.3d at 899 (citations omitted).

In *Iaea vs. Sunn*, 800 F.2d 861(9th Cir. 1986) defense counsel represented to the defendant that a guilty plea would give him a chance to receive probation.   That advice was defective because of mandatory minimum sentences which resulted in his receiving

13

life sentences. The court found that such a gross mischaracterization (probation v. life sentences) established defective performance by counsel and remanded the case for a determination on the prejudice component of the ineffective assistance claim. *Id.* at 865-66.   *See also Doganiere v. United States*, 914 F.2d 165, 168 (9th Cir. 1990), cert. denied, 499 U.S. 940 (1991)(no ineffectiveness where actual sentence was three years longer than attorney predicted).

In contrast, in *Womack v. Del Papa*, 487 F.3d 998 (9th Cir. 2007), counsel had predicted a sentence upon pleading guilty of 30 to 40 years, and instead the defendant received eight life terms without parole.  The Ninth Circuit distinguished *Iaea*, and found the plea nonetheless voluntary.

Here, the effective prediction by trial counsel of Petitioner's sentencing exposure at trial was "a presumptive of ten years with a maximum of 15 and a super-minimum of six." (Exhibit B, R.T. 5/29/9 at 15-16.)

Instead, Petitioner received a combined sentence of 20 years.  Whether compared to the "super-minimum" of 6 or the maximum of 15, the difference between counsel's prediction and reality did not amount to the kind of gross mischaracterization that the courts have been willing to deem defective performance.

### b.   Prejudice

Even if Petitioner could establish defective performance, he fails to show that the conclusion of the Arizona Court of Appeals (that he failed to show prejudice and that his claim was therefore without merit) was contrary to or an unreasonable application of Supreme Court law, or an unreasonable determination of the facts.

The Supreme Court has instructed that a state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Lockyer v. Andrade*,  538

U.S. 63, 73 (2003) (internal quotation marks omitted).

Here, the Arizona court identified the correct standard, as laid out in the companion cases *Lafler* and *Frye*, *i.e.* that Petitioner was required to show a reasonable probability that had he been properly advised he would have proceeded with the plea. Moreover, Petitioner does not point to any factually indistinguishable Supreme Court case reaching a contrary result, and the undersigned has found none.  Thus, their decision was not contrary to Supreme Court law.

"[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000). Distinguishing between an unreasonable and an incorrect application of federal law, the *Williams* Court clarified that even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable. *Id*. at 410-411.

Petitioner proffers nothing to show that the Arizona court unreasonably applied *Lafler* and *Frye* (or any other applicable standard) to the facts of his case.

Finally, Petitioner proffers nothing to suggest that the Arizona court made an error in determining the historical facts.  Petitioner was plainly focused on the potential of winning his motion to suppress or a trial, and on his contention that the offer was ridiculous.

Even if this Court could find some factual error, "a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).  Petitioner does not suggest how any fact-finding was unreasonable.

Moreover, given Petitioner's rejection of the guaranteed 4.5 years under the plea, in the face of what was represented to be a potential 15 year maximum sentence, the undersigned cannot find a reasonable probability that Petitioner would have altered

course and accepted the plea if he had been advised he could receive a 20 year sentence.

To the contrary, Petitioner's explicit motivation in rejecting the plea was to secure custody of his daughter which he believed only possible by an immediate release after victory, either through the motion to suppress or at trial.  Under Petitioner's perception of his circumstances any sentence, whether of 4.5 or 6 or 10 or 15 or 20 years, would have resulted in the loss of custody of his daughter.

In light of that motivation, and in light of Petitioner's confidence in his ultimate success, the undersigned cannot find a reasonable probability that Petitioner would have accepted the plea offer had counsel advised him of the potential for consecutive sentences.

**7.  Summary**

Based upon the forgoing, the undersigned concludes that Petitioner's claim in Ground 1 is without merit.  Accordingly, Petitioner's Petition must be denied.

## IV.    CERTIFICATE OF APPEALABILITY

**Ruling Required** - Rule 11(a), Rules Governing Section 2254 Cases, requires that in habeas cases the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Such certificates are required in cases concerning detention arising "out of process issued by a State court", or in a proceeding under 28 U.S.C. § 2255 attacking a federal criminal judgment or sentence. 28 U.S.C. § 2253(c)(1).

Here, the Petition is brought pursuant to 28 U.S.C. § 2254, and challenges detention pursuant to a State court judgment.  The recommendations if accepted will result in Petitioner's Petition being resolved adversely to Petitioner.  Accordingly, a decision on a certificate of appealability is required.

**Applicable Standards** - The standard for issuing a certificate of appealability ("COA") is whether the applicant has "made a substantial showing of the denial of a

16

constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

**Standard Not Met** - Assuming the recommendations herein are followed in the district court's judgment, that decision will be on the merits. Under the reasoning set forth herein, jurists of reason would not find the district court's assessment of the constitutional claims debatable or wrong.

Accordingly, to the extent that the Court adopts this Report & Recommendation as to the Petition, a certificate of appealability should be denied.

## V.   RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that the Petitioner's Petition for Writ of Habeas Corpus, filed November 25, 2015 (Doc. 1) be **DENIED**.

**IT IS FURTHER RECOMMENDED** that, to the extent the foregoing findings and recommendations are adopted in the District Court's order, a Certificate of Appealability be **DENIED**.

## VI.   EFFECT OF RECOMMENDATION

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to *Rule 4(a)(1), Federal Rules*

*of Appellate Procedure*, should not be filed until entry of the district court's judgment.

However, pursuant to *Rule 72(b), Federal Rules of Civil Procedure,* the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the Court.  *See also* Rule 8(b), Rules Governing Section 2254 Proceedings. Thereafter, the parties have fourteen (14) days within which to file a response to the objections.  Failure to timely file objections to any findings or recommendations of the Magistrate Judge will be considered a waiver of a party's right to *de novo* consideration of the issues,  *see United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)(*en banc*),  and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the recommendation of the Magistrate Judge, *Robbins v. Carey*, 481 F.3d 1143, 1146-47 (9th Cir. 2007).

Dated: June 27, 2016

15-2416r RR 16 06 10 on HC.docx

James F. Metcalf
United States Magistrate Judge